MERCHANTS NATIONAL BANK OF SAVANNAH v. DEMERE.

1. Where one, on a promissory note executed in his own name, borrows money from a bank for its cashier, the cashier putting up collaterals belonging to himself, the officers representing the bank in making the loan not being aware that the money was for the use of the cashier or that the collaterals belonged to him, and not acquiring this information until after the cashier had fraudulently withdrawn the collaterals and applied them to his own use, the bank is not accountable for their value in settling its claim against the borrower for this loan and for other transactions giving rise to a general balance against him in favor of the bank.

2. The agency of the cashier of a bank to assign its assets of which he is the immediate custodian, does not extend to assets held as collateral security for a loan made to another person for his benefit and secured, not by collaterals belonging to that person, but furnished by the cashier himself.

| 92 | 735 |
| 106 | 332 |
| 92 | 735 |
| †108 | 532 |
| 92 | 735 |
| ⊕112 | 827 |
| 92 | 73ŋ |
| 110 | 149 |
| 92 | 785 |
| 116 | 829 |
| 92 | 735 |
| ⊕119 | 192 |
| 92 | 735 |
| 122 | 364 |
| 92 | 735 |
| 126 | 709 |

3. Where one borrows money from a bank, and in the note given therefor pledges certain collaterals for the payment of that note and for "any general balance due or to become due" the bank, the borrower has no right to withdraw the collaterals without the consent of the bank, on payment or tendering payment of the note only, if the bank is the holder of other just demands against him not then fully secured otherwise according to sound business principles and the rules of practical banking.

4. Under the evidence act of 1889, the plaintiff could not testify to a conversation between himself and the president of the bank, who had since died, unless it was heard by some third person, and the burden was on the plaintiff to show that it was.

January 8, 1894.

Trover. Before Judge MacDONELL. City court of Savannah. May term, 1893.

ERWIN, duBIGNON & CHISHOLM and BARROW & OSBORNE, for plaintiff in error.

CHARLTON, MACKALL & ANDERSON, contra.

SIMMONS, Justice.

Gadsden, the cashier of the Merchants National Bank, desiring to borrow $10,000, induced Demere to apply to the bank in his own name for a loan of that amount, it being privately understood between Gadsden and Demere that the money, when obtained, should be turned over to him (Gadsden), for Gadsden's own use and benefit, and that he should furnish certain stocks and bonds to be put up in Demere's name as collateral security to the bank on Demere's note for the loan. The loan was granted, and the money turned over by Demere to Gadsden, Demere giving his note therefor, dated October 11th, 1890, and stating therein that the same was secured by 60 shares of stock of the Central Railroad and Banking Company and $4,000 of Northwestern North Carolina Railroad Company bonds; and on the same date, bonds and certificates of stock of this description and amount, which had been deposited by Gadsden with another bank as collateral security on notes of his own, were delivered by that bank to Gadsden, the stock

having been transferred in due form to the Merchants
National Bank; and an entry was made on the latter's
books showing that the stock and bonds mentioned had
been deposited with it as collateral to secure Demere's
note for this loan. Gadsden, as cashier, was custodian
of all collaterals in the hands of the bank. It does not
appear that the officers who made the loan knew that
the money was borrowed for Gadsden's use or benefit,
or that the collaterals belonged to him. Gadsden after-
wards gave to Demere $5,500 to be paid to the bank as
a credit on the note, and this amount was paid and
credited, and he withdrew a part of the collaterals with
Demere's knowledge. Demere subsequently, at different
times, borrowed other amounts from the bank for his
individual use, giving his notes and depositing collat-
erals to secure the payment thereof. These notes, as
well as the note first mentioned, contained this clause:

"To secure the prompt payment of this note, *or any
general balance due or to become due* the Merchants Na-
tional Bank, I hereby pledge the following collaterals
now in possession of said corporation, (describing); it
being hereby agreed that other collaterals of equal value
may be substituted for the above with the consent of
said corporation, which collaterals, when so substituted,
shall be subject to this pledge; and I represent and cov-
enant that I have full power and authority to pledge
such collaterals. And I hereby constitute the president
and cashier of said corporation, jointly and severally,
my attorney or attorneys to collect, sell or otherwise
dispose of the whole or any portion of said collaterals,
either at public or private sale, and without notice to
me of an intention to sell, either for the purpose of pay-
ing said note when due, or in case margin shall not be
furnished by me when required. And I authorize the
said Merchants National Bank to become the purchaser
on its account at any such sale or sales, and for that
purpose in my name to sign and execute any transfer,
conveyance or instrument in writing, whether under
seal or otherwise, which may be necessary and lawful in
the premises."

On April 1st, 1891, the president of the bank ascertained that Gadsden had used the name of the bank for a large amount in an individual transaction. He summoned the board of directors together, and they resolved to demand Gadsden's resignation and examine his accounts. On April 3d, 1891, Gadsden killed himself. Demere thereupon went to the bank and notified the president that the above mentioned note of October 11th, 1890, was not for his own benefit, that he did not furnish the collaterals which had been deposited to secure it, that he had received none of the money obtained on the note, and that the money had been borrowed at the request of Gadsden and for Gadsden's benefit. Upon examination into the matter, it was ascertained that Gadsden had abstracted the collaterals in question, and had caused the stock to be transferred to third persons from whom he had borrowed money, leaving this note unsecured. Shortly thereafter one of Demere's other notes fell due, and he went to the bank and tendered a check in payment of it and demanded the collaterals which he had deposited to secure it. The demand was refused, and he brought an action of trover against the bank to recover the collaterals demanded. The jury returned a verdict for the plaintiff, and the defendant's motion for a new trial being overruled, the case was brought to this court for review.

1, 2. If the officers who represented the bank in making the loan for which the note of October 11th, 1890, was given, did not know that the money was borrowed for the cashier and that the collaterals deposited to secure the note belonged to him, and remained ignorant of this until after he had fraudulently withdrawn the collaterals and applied them to his own use, the bank was not accountable for their value in settling its claim against the borrower for this loan and for other transactions giving rise to a general balance against him

in favor of the bank. As owner of the collaterals, the cashier was an opposite party in interest to the bank, and his custody of this property for the bank involved a risk which it may not have been willing to assume. It was entitled to know the facts, so that it might either decline the risk or guard against such a result as followed; it was a fraud on the part of the cashier to withhold the facts from the other officers of the bank; and the plaintiff, being privy to the deception, and having stood by without communicating the facts until his partner in the fraud had misappropriated the collaterals, cannot now require the bank to make good to him their value. He could not by thus colluding with the cashier cast this risk upon the bank and compel it to protect him against any loss that might ensue. The diligence which a bank owes to a borrower to furnish a good custodian for his property deposited with it as collateral security for the loan, does not extend to protection against a theft by its cashier of his (the cashier's) own property, which got into his official custody by reason of the borrower's having united with him in deceiving the bank. Under such circumstances, the cashier's knowledge is not the knowledge of the bank, and his fraudulent transfer in its name but in his own behalf of property held in this manner is not the act of the bank. His agency as cashier to assign its assets, of which he is the immediate custodian, does not cover an act of this kind. 1 Morse on Banks and Banking (3d ed.), §§99, 136 *et seq.*; Story on Agency, §210; *Savannah Bank and Trust Co.* v. *Hartridge*, 73 *Ga.* 223.

3. The promissory note with which the bonds sued for were delivered to the bank contained, as we have seen, together with a description of them, a clause reciting that the collaterals therein described were pledged " to secure the prompt payment of this note, or any general balance due or to become due " the bank; and

it was contended on the part of the bank, that the plaintiff's note of October 11th, 1890, being left unsecured by the withdrawal of the collaterals deposited therewith, and there being a general balance against him on his account with the bank, this stipulation precluded his withdrawing the bonds in question, without the consent of the bank, on his paying or tendering payment of the first mentioned note only. We think this contention is correct. Under this stipulation, the plaintiff had no right to withdraw the bonds on the payment of that note, if the bank was the holder of other just demands against him not then fully secured otherwise according to sound business principles and the rules of practical banking. In so far as any local usage was inconsistent with the express terms of the contract, it was irrelevant and inadmissible. Clarke's Browne on Usages and Customs, pp. 82–84; *Park* v. *Piedmont Ins. Co.*, 48 *Ga.* 601; *Werner* v. *Footman*, 54 *Ga.* 128, 137; *Emery* v. *Atlanta Exchange*, 88 *Ga.* 321, 330(2); *Stamey* v. *Western Union Telegraph Co.*, this term. *Ante*, 613.

4. The court below, upon objection by the defendant, refused to allow the plaintiff to testify as to a conversation between himself and the president of the bank, it being admitted that the latter was dead ; and to this ruling the plaintiff excepted *pendente lite* and assigned error thereon. He testified that this conversation was had in the presence of certain clerks and directors of the bank, but did not know that any of them knew what was said. The plaintiff not showing affirmatively that any of these persons heard and knew what was said between himself and the deceased, the court did not err in holding that the conversation was inadmissible. (Acts 1889, p. 85.)

It follows, from what we have ruled upon the questions made by the main bill of exceptions, that a new trial should be granted, and the judgment refusing a new trial is *reversed*. As to the exceptions filed by the defendant in error, the judgment is *affirmed*.