## Ohio Valley Banking & Trust Company v. Citizens National Bank.

(Decided February 2, 1917.)

### Appeal from Henderson Circuit Court.

1. Banks and Banking—Wrongful Acts of Officers.—Wrongful acts of an officer of a bank, done in the interest of the bank, or in the course of the dealings of the officer as the representative of the bank, may be attributed to the bank; but a bank cannot be held liable for the wrongful acts of its officers done in their purely individual capacity.

2. Banks and Banking—Knowledge of Acts of Officers.—A bank is to be charged with the knowledge acquired by its cashier, or other officer, pertaining to transactions within the scope of the bank's business, although such knowledge be acquired in another transaction than that to which it relates.

3. Banks and Banking—When Knowledge of Act of Officers Not Imputed to Bank.—When a bank officer is individually interested in a note or other matter pertaining to the bank's affairs, the better opinion is that his knowledge is not to be imputed to his bank, since his interest is best served by concealing it.

4. Principal and Agent—Knowledge of Agent.—A principal is not charged with the knowledge of his agent when the agent is engaged in committing an independent fraudulent act on his own account, and the facts sought to be imputed to his principal relate to this fraudulent act.

5. Corporations—Knowledge of Officers.—The exceptional rule which does not impute the oficer's knowledge to his corporation when the officer is acting in his own interest, does not apply when the

officer of the corporation, though he acts for himself or a third person, is also the sole representative of the corporation in the transaction. Citizens Savings Bank v. Walden, 21 Ky. L. R. 739, 52 S. W. 953; Mutual Life Ins. Co. v. Chosen Friends Lodge, 29 Ky. L. R. 394, 93 S. W. 1044.

YEAMAN & YEAMAN and MONTGOMERY MERRITT for appellant.

JOHN C. WORSHAM, O. W. McGINNIS and HENSON & TAYLOR for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

On December 22, 1913, Ingram Crockett of Henderson, Ky., borrowed $5,800.00 from the Bankers National Bank, of Evansville, Ind. On January 19, 1914, Crockett borrowed the further sum of $1,950.00 from the same bank. To secure the payment of his notes given for these loans, Crockett pledged, as collateral security, stock certificate No. 457 for 30 shares, and certificate No. 458 for 25 shares of the capital stock of the Planters State Bank, of Henderson, which stood in Crockett's name. For brevity, the Planters State Bank of Henderson will be called the Henderson Bank, and the Bankers National Bank of Evansville will be designated as the Evansville Bank, in this opinion.

At the time these loans were made to Crockett he was the cashier of the Henderson Bank. These transactions were, however, the individual contracts of Crockett, in which the bank had no interest, or concern.

On February 3, 1914, Crockett wrote to the Evansville Bank, as follows:

"Henderson, Ky., February 3, 1914.

"Bankers National Bank,
    "Evansville, Ind.

"Dear Sirs:—

"Will you kindly send me my bank stock for re-issue of several certificates? I hope to make you a payment on my note.

"Yours very truly,
                    "INGRAM CROCKETT."

To this request the Evansville Bank answered, as follows:

"Evansville, Ind., February 4, 1914.

"Mr. Ingram Crockett,
    "Cashier Planters State Bank,
        "Henderson, Kentucky.

"Dear Sir:—

"As per your request of the 3rd we enclose to you herewith certificates No. 457 and No. 458 for 55 shares of the capital stock of the Planters State Bank of Henderson, Kentucky, to be re-issued and returned to us, or if part or all of the stock be disposed of, proceeds of same returned to us in lieu of stock.

"Very truly yours,
    "SAM T. HESTON, President."

The envelope in which this letter of February 4th was enclosed was addressed to "Ingram Crockett, Cashier, Henderson, Ky." The letter was sent registered and was delivered to Carl Selle, a nineteen year old clerk in the Henderson Bank, on February 5, 1914. Selle delivered the letter by immediately placing it upon Crockett's desk in the bank. Crockett surrendered stock certificate No. 458 for 25 shares of the capital stock of the Henderson Bank, and in lieu thereof there was issued to him, on February 14, 1914, certificate No. 474 for 15 shares, and certificate No. 475 for 5 shares. The remaining 5 shares called for by certificate 458, he had issued, with another share of stock, to Strachan Barret in certificate No. 473 for 6 shares. In this way Crockett caused 26 shares of stock to be surrendered and re-issued, although only 25 of them had been pledged to the Evansville Bank. The new certificates were signed by the president and cashier of the bank, in the ordinary course of business.

On February 19, 1914, five days after the stock was re-issued as above set forth, Crockett returned original certificate No. 457 for 30 shares to the Evansville Bank, and paid $1,500.00 upon his indebtedness to that bank, by paying that amount to the Henderson Bank and having it credited to the account of the Evansville Bank. It does not appear what Crockett said to the Evansville Bank in his letter returning the certificate for the 30 shares.

On March 15, 1914, Crockett absconded, and the details of the transaction as above set forth, gradually became known. No one in either bank, except Crockett,

had any knowledge of his misapplication of the stock or its proceeds, until after his flight.

On March 18, 1914, the Evansville Bank wrote the Henderson Bank, inquiring about the 25 shares of stock which Crockett had converted to his own use; whereupon the new cashier of the Henderson Bank answered, as follows.

"Henderson, Ky., March 20, 1914.

"Mr. Sam T. Heston, President,
  "Bankers National Bank,
    "Evansville, Ind.

"Dear Sir:—

"Your letter of the 18th inst., received. I do not know anything about the stock transaction with Mr. Crockett.

"I have examined your account and find you have credit for $1,500.00, by Crockett.

"Yours truly,
  "FRED P. GEIBEL, Cashier."

In June, 1914, the Ohio Valley Banking & Trust Co., of Henderson, was consolidated with and became the successor of the Planters State Bank, of Henderson, and the owner of its assets. Likewise, on August 15, 1914, the Bankers National Bank, of Evansville, and the Citizens National Bank, of Evansville, were consolidated, the Citizens National Bank succeeding to all the assets of the Bankers National Bank, of Evansville.

On December 24, 1915, the Citizens National Bank, of Evansville, brought this action against the Ohio Valley Banking & Trust Co., of Henderson, to recover $4,500.00, the value of the 25 shares of stock which it alleged that Crockett, as cashier of the Henderson Bank, had converted to the use of that bank.

To this claim, however, the defendant was entitled, under any view of the case, to a credit of $1,500.00 paid by Crockett at the time he converted the stock. This credit is not disputed.

Upon a trial there was a verdict and judgment against the Henderson Bank for $2,625.00, and it appeals.

The jury fixed the value of the converted stock at $165.00 per share, or $4,125.00; and, after giving credit thereon for the $1,500.00 paid by Crockett, there was left the balance of $2,625.00 fixed by the verdict.

The Evansville Bank rests its case upon the proposition that where a cashier of a bank receives funds, checks, or other instruments, as the representative of the bank, and misapplies them, his bank is liable. On the other hand, the Henderson Bank insists that one who deals with the cashier of a bank, or other agent, about a matter personal to the agent, and in which the principal is not interested, cannot look to the principal for any default of the agent; and, in applying that doctrine to the facts of this case, it is insisted the proof shows, beyond a doubt, that the Evansville Bank dealt with Crockett in his individual capacity and not as cashier of the Henderson Bank, and that the Henderson Bank is, therefore, not liable for Crockett's fraudulent acts, and its motion for a directed verdict should have been sustained.

It will be noticed that there are no disputed facts in this case in so far as they relate to the liability or non-liability of the Henderson Bank; the parties differ merely as to what is the law under the uncontroverted facts, as above stated. The value of the converted shares was the only controverted question of fact, under the proof.

Plaintiff's first proposition, that when the cashier of a bank receives funds, checks or other instruments as the representative of the bank, and misapplies them, his bank is liable, begs the question at issue in this case, since it is based upon the assumption that Crockett received the certificate of stock in question, as the representative of the Henderson Bank. That, however, is the question in issue; and the determination of that question will necessarily operate as the decision of this case.

Plaintiff's second proposition, that when an officer of a corporation does an act which constitutes a fraud upon a third person, or upon another corporation of which he is an officer, the first mentioned corporation where the officer also represents it in the transaction, is chargeable with notice of the nature of the transaction, although the fraud is perpetrated for the officer's own benefit, is, in so far as it can be applied to this case, but a repetition of its first proposition, since it is based upon the assumption that Crockett perpetrated the fraud as the cashier of the Henderson Bank. But, as above stated, that is the very question in issue.

Finally, plaintiff insists that where stock comes to the hands of an agent, in the usual course of business, his principal is chargeable with notice of the purpose for which the stock was so delivered, and, if it be fraudu-

lently diverted by the agent from the purpose for which it was received, the principal is liable. This proposition, however, is likewise based upon the theory that when Crockett received the certificates of stock from the Evansville Bank, he received them as agent for the Henderson Bank; when, in fact, the whole controversy turns upon the fact whether Crockett received the certificate of stock in his own right, or as cashier for the Henderson Bank.

Consequently, plaintiff's argument, under every view of it, comes back to the single proposition, that Crockett received the certificates of stock as the agent of the Henderson Bank, and not in his individual right. The defendant controverts this proposition, and correctly insists that the general law of agency applies as between a cashier and his bank and third parties; and, that whenever one deals with an agent, in his own right and about his own business, whether the agent be a cashier or acting in some other capacity, the person so dealing with the agent is put on notice that the agent is not acting for his principal, but is acting for himself.

Unquestionably, the Henderson Bank is liable if Crockett was acting as its agent in the transaction with the Evansville Bank.

In 7 Corpus Juris, page 543, the elementary rule is thus stated:

"Wrongful acts of an officer of a bank done in the interest of the bank or in the course of dealings of the officer as representative of the bank may be attributed to the bank; but a bank cannot be held liable for wrongful acts of its officers done in their purely individual capacity," citing, American National Bank v. Warren Deposit Bank, 29 Ky. L. R. 195, 93 S. W. 585, and cases from other states in support of the text.

Ruohs v. Bank, 94 Tenn. 57; Merchants Nat. Bank v. Demere, 92 Ga. 735; Graham v. Orange County Nat. Bank, 59 N. J. L. 225; Richardson v. Watson, 51 La. Ann. 1390; Baker v. Berry Hill Mineral Springs Co., 112 Va. 280; and Jones v. Lincoln, 3 Nebr. 73, 90 N. W. 912, present interesting illustrations of the rule.

Necessarily, it is the nature of the business done that determines whether an agency exists. A bank cashier has the right to attend to his individual business at his bank; and, by doing so he, in no way, makes it the bank's business. His claim that his private business is the bank's business, cannot make it so.

There can be no doubt that the original transactions by which Crockett borrowed the money from the Evansville Bank and pledged his individual certificates of stock for the loan, were clearly and certainly his individual transactions in which the bank had no interest whatever. They did not appear upon the books of the Henderson Bank. And, when Crocket wrote to the Evansville Bank on February 3, 1914, asking it to "send me my bank stock," and signed the letter "Ingram Crockett," he certainly was acting for himself.

Up to this point, it is not contended, and could not be contended with even the slightest degree of plausibility, that Crockett was acting for the Henderson Bank. How then did it become the business of the bank? How did the transformation take place? The answer is: "By sending the certificates to 'Ingram Crockett, cashier.'"

But, can it be said that when the Evansville Bank answered, sending him the certificates of stock, "as per your (individual) request of the 3rd we enclose to *you*," the stock certificates in question, it was dealing with Crockett as cashier of the Henderson Bank by merely designating him as cashier in the letter? We would be slow to admit that the whole nature of the transaction could be thus radically changed. The certificates were returned at Crockett's personal request; he did not even claim to be acting as cashier.

If the letter had gone into the hands of the president of the bank, certainly he could not have treated it as a bank transaction, but could only have turned it over to Crockett who was alone interested in it. The bank had no right to deal with the two certificates of stock that were returned to Crockett, since they were Crockett's individual property; and, as between himself and his bank, he alone had the right to their custody.

If the president of the Henderson Bank had opened the letter and had claimed to hold the certificates as the property of the bank, would Crockett have been deprived of his stock by the unfounded claim? Most certainly not.

Furthermore, when Crockett returned the certificate for the thirty shares of stock, can it be said that he returned it as cashier when it was his stock, pledged to secure his own debt to the Evansville Bank and in a transaction which did not appear upon the books of the Henderson Bank, and in which it had no interest? We do not understand that so bold a claim is made. And, if he had returned the certificate for the twenty-five shares of stock

which stood in his own name and was pledged to the Evansville Bank for his individual debt, he certainly would have returned it as Crockett, and not as cashier.

If, after he had disposed of the twenty-five shares of stock he had returned the proceeds received therefor to the Evansville Bank, he would have returned them not as cashier, nor as the Planters State Bank, but as Crockett, to be credited on his personal note, given for money that he had borrowed for his own use. The Henderson Bank would have had no voice or agency in the transaction, and would never have heard of it, even after Crockett's defalcation.

It seems, therefore, necessarily to follow that the Evansville Bank could not change the character of the transaction and convert Crockett's individual business into the business of the bank and make it liable, by sending the certificates to ''Crockett, cashier.'' It did not thereby change or affect the ownership of the certificates in the slightest degree.

When, therefore, we conclude, as we must, that Crockett acted in his own behalf and not as the agent of the Henderson Bank throughout this transaction, it would seem that the discussion is ended, and that the judgment must be reversed.

It is said, however, that the Henderson Bank is chargeable with notice of the nature of the transaction between Crockett and the Evansville Bank, and that it is, therefore, liable for Crockett's fraudulent disposition of the stock.

By this we understand the plaintiff's contention to be that Crockett's fraudulent act in converting the stock to his own use is to be imputed to the Henderson Bank, because Crockett was its cashier. This is an attempt to apply the rule that a bank is to be charged with the knowledge acquired by its cashier, or other officer, pertaining to transactions within the scope of the bank's business, although such knowledge be acquired in another transaction than that to which it relates. 5 Cyc. 460.

We do not see, however, how this rule can be invoked here, for several reasons. In the first place, Crockett did no unlawful act until after his transactions with the Henderson Bank, in transferring the stock, had ended. He had the right to surrender the stock and demand new certificates therefor; and, the Henderson Bank merely recognized that right, which it could have been compelled

to do. Crockett's unlawful acts were all done subsequently. .

Neither can it be said that any knowledge that Crockett had, as distinguished from his possible intention, could have affected the rights or liabilities of the Henderson Bank, even though such knowledge should be imputed to it. It is knowledge upon the part of the officer and not his purpose or intention that is imputed to his principal, under the rule invoked. At the time Crockett surrendered the old certificate and procured the new ones, he may have had no intention of fraudulently converting them to his own use. But, whatever may have been his intention, he had the right to exchange the old certificate for new ones.

In this respect this case is similar to Brookhouse v. Union Publishing Co., 73 N. H. 368, 2 L. R. A. (N. S.) 993. In that case Moore was the defendant's treasurer and manager, having the practical control of its affairs. He was also guardian for the plaintiff, Nina Brookhouse. There was an assistant treasurer, having the same powers and duties as Moore, in his absence. Moore used defendant's deposit account in the Manchester National Bank as a conduit for his private enterprises, keeping a record of them upon defendant's books. He withdrew from the guardian's bank account, money for which he received certificates of deposit and bank drafts payable to himself as guardian, or order. He endorsed these and directed the assistant treasurer to deposit them to the publishing company's bank account, which was done. For his own purposes Moore subsequently checked out the money.

In the suit by Nina Brookhouse v. The Union Publishing Co., to recover the money which Moore had withdrawn as her guardian and deposited to the credit of the Publishing Company, and was subsequently withdrawn and used for his own benefit, the Publishing Company's liability turned upon the fact whether it received the money with notice of the trust, and had aided Moore in wrongfully diverting it to his own use.

But, in speaking of the legal effect of Moore's acts, and denying the relief prayed, the court said:

"By reason of his position as guardian, and the form of the papers, he had absolute control of the manner in which they should be used. No license from the probate court or other source was necessary. He could transfer them directly to the persons to whom he intended ulti-

mately to pay the money represented by them, or he could convert them into currency and use that, or he could deposit them in a bank in his name as guardian, or in his own name without further description, and draw checks against the deposit. If he transferred them directly to a person in payment of his private indebtedness, or for some other consideration known to be for his private benefit, the form of the paper alone would be sufficient to put the person upon inquiry as to his right to so use the paper, and to charge him with knowledge of the facts he would thus learn. Such use is generally wholly inconsistent with the guardian's rights, and it is not made in the ordinary course of business. But the indorsee of such papers, who receives them in the course of changing them into currency, or in the course of distributing the credits they represent by means of a temporary deposit, is not put upon inquiry by the mere form of the paper; for such use is consistent with the guardian's rights and duty. To charge such indorsee with responsibility for a misapplication of the funds, it must appear that he had knowledge of the contemplated misapplication, or of facts that would put him upon inquiry. Even a mingling of guardianship funds with private funds in a deposit account with a bank, kept in the guardian's individual name, is not, in itself, unlawful, though it be unwise. In such case the form of the paper will not impose upon the bank the duty of seeing to it that the guardianship portion of the account is properly used. The ordinary presumption applies, that the guardian is acting in good faith, and will make a proper use of the money in drawing checks against the deposit. See Sherburne v. Goodwin, 44 N. H. 271, 279.

"The only obligation of the bank is to honor the checks that are duly drawn against the account in the form it is kept. To charge banks with the duty of supervising the administration of trusts, when, in the due course of business, they receive checks and drafts payable to and properly indorsed by trustees in their trust capacity, would place an unreasonable burden upon the banks, and seriously interfere with commercial transactions. The law imposes no such duty upon banks. Bank Comrs. v. Security Trust Co., 70 N. H. 536, 550, 551, 49 Atl. 113; Goodwin v. American Nat. Bank, 48 Conn. 550; Essex County v. Newark City Bank, 48 N. J. Eq. 51, 21 Atl. 185; State Nat. Bank. v. Reilly, 124 Ill. 464, 14 N. E. 657; Coleman v. First Nat. Bank, 94 Tex. 605, 86 A. St.

Rep. 871, 63 S. W. 867; Interstate Nat. Bank v. Claxton, 97 Tex. 569, 65 L. R. A. 820, 104 Am. St. Rep. 885, 80 S. W. 604; Central Nat. Bank v. Connecticut Mut. L. Ins. Co., 104 U. S. 63, 26 L. Ed. 698; Gray v. Johnston, L. R. 3 H. L. 1; 2 Dan. Neg. Inst. sec. 1612. It is true that the defendant is not a banker, but its obligation to Moore in respect to funds which he placed in its bank account, or in its possession, to be there deposited, was like that of a bank to its depositors."

It should not be overlooked that Crocket did not pretend to be acting for the Henderson Bank; that the Henderson Bank did not pretend to be acting for the Evansville Bank; that there is nothing in the books of the Henderson Bank pretending to show that this transaction was its business; and that there is no claim that it profited one cent by the transaction.

Furthermore, a well recognized exception to the general rule that a principal is chargeable with the knowledge acquired by his agent exists where the officer of a bank is personally interested in a transaction to which the bank is also a party in interest. The reason for the exception is that the officer will not be presumed to impart knowledge which is adverse to his own interest.

In 5 Cyc. 461, under the head of "Banks and Banking," the rule is stated as follows:

"When an officer is individually interested in a note or other matter, the better opinion is that his knowledge is not to be imputed to his bank, since his interest is best served by concealing it."

See also 7 C. J., pp. 534, 552; Bolles' Modern Law of Banking, 350, 393, 400.

In 10 Cyc. 1063, the rule is stated as follows:

"If a corporate officer or agent acts avowedly for himself in a transaction with the corporation, he is regarded as a stranger to the corporation, dealing as if he had no official relation with it. When, therefore, an officer, director, or agent of a corporation deals with the corporation for himself in his private capacity, any uncommunicated knowledge which he may have in respect of the transaction will not be imputed to the latter by reason of it. If, therefore, it is desired to charge the corporation with a knowledge of such facts affirmative evidence must be given that the officer has made a disclosure to other and disinterested officers of the corporation, whose knowledge may properly be said to be that of the

corporation; or at least that he made such disclosure as ought to have put them on inquiry."

In Brookhouse v. Union Publishing Co., from which we have heretofore quoted, the court further said:

"The plaintiff further says that the defendant had notice of the fraud through Moore himself, its treasurer and general manager. It is true that a principal is ordinarily chargeable with the knowledge acquired by his agent in executing the agency, and is subject to the liabilities which such knowledge imposes. But there is a well established exception to this rule, by which the principal is not charged with the knowledge of his agent when the latter is engaged in 'committing an independent, fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act.' Allen v. South Boston R. Co., 150 Mass. 200, 5 L. R. A. 716, 15 Am. St. Rep. 185, 22 N. E. 917; Indian Head Nat. Bank v. Clark, 166 Mass. 27, 43 N. E. 912; Produce Exchange Trust Co. v. Bierberbach, 176 Mass. 577, 588, 58 N. E. 162; Camden Safe Deposit & T. Co. v. Lord, 67 N. J. Eq. 489, 58 Atl. 607; Gunster v. Scranton Illuminating, H. & P. Co., 181 Pa. 327, 59 Am. St. Rep. 650, 37 Atl. 550; Frenkel v. Hudson, 82 Ala. 158, 60 Am. Rep. 736, 2 So. 758; American Surety Co. v. Pauly, 170 U. S. 133, 42 L. ed. 977, 18 Sup. Ct. Rep. 552; 2 Pom. Eq. Jur. 3rd. ed., sec. 675, and authorities cited in notes; 1 Am. & Eng. Enc. Law, 2d ed. p. 1145, and authorities cited in notes. This exception was recognized in this state in Clark v. Marshall, 62 N. H. 498, 500."

Kentucky approved this rule as early as 1831, in Lyne v. Bank of Kentucky, 5 J. J. M. 560. In that case it was sought to charge the bank with knowledge of a conveyance which had been made to Snead, one of its directors, in his individual capacity. But, in refusing to so charge the bank, the court said:

"The notice which Snead had of the execution of the deed of 1810, and the fact of his being a director of the bank in 1819, when the deed by Hunter to Blanton, &c., was executed, connected together, constitute all the notice which the bank or its directors ever had of the existence of the deed of 1810.

"We have already intimated that the knowledge of one director alone is insufficient. He may not be present when the board determines to accept a conveyance for the property, which he may know has previously been conveyed to another. His absence may be without fault

on his part, and since his knowledge was acquired, he may not have had an opportunity to communicate it to any other director. Must the corporation lose under such circumstances, when the law has not been complied with, which prescribes the rule for giving notice by recording the prior deed in proper time? But suppose the director to attend, and from some motive, worthy or base, no matter which, he conceals his knowledge from the board, shall the secret locked up in his own breast, vitiate an act of the majority done in good faith? But we will pursue this course of remark no further. However, we may think proper ultimately, to decide the effect of notice to one director, we are confident that notice to one will never be regarded by us as notice to the board, when that one is interested in protecting his own title by not communicating his knowledge to the board.''

In Davis v. Boone County Deposit Bank, 25 Ky. L. R. 2079, 80 S. W. 161, Davis defended by pleading that the note had been procured by the fraudulent misrepresentations of the payee, and was without consideration.

In overruling that defense the court said:

''The only attempt in the record to charge the bank with notice of the infirmity of the paper was the claim that its attorney, who was the president of the corporation for whose benefit the note is alleged to have been taken, was in a position to know, and presumably knew, of the lack of consideration. Even if it be conceded that the attorney actually knew of the facts alleged in the answer as constituting the fraud perpetrated on appellant by the payees of the note, the facts show, as far as they show anything on that point, that the attorney's interest was hostile to the bank, and therefore, there is no presumption that he gave the bank the information on that subject that he might have had. This evidence alone was not enough to charge the bank with notice.''

The rule has been recognized in American National Bank v. Warren Deposit Bank, 29 Ky. L. R. 195, 93 S. W. 585; Sebald v. Citizens Deposit Bank, 31 Ky. L. R. 1244, 105 S. W. 130, 14 L. R. A. (N. S.) 379; Randolph v. Ballard County Bank, 142 Ky. 145; First National Bank v. Chowning Electric Co., 142 Ky. 625; Robertson v. Commercial Security Co., 153 Ky. 340; Rockport Coal Co. v. Carter, 157 Ky. 560; White Plains Coal Co. v. Teague, 163 Ky. 111; Taulbee v. Hargis, 173 Ky. 433; Hier v. Miller, 68 Kans. 258, 65 L. R. A. 952; State Bank of Isanti v. Mutual Tel. Co., 123 Minn. 314; Ann Cas.

1915A, 1082; Lamson v. Beard, Receiver, 94 Fed. 90, 45 L. R. A. 822; Debaca v. Higgins (Colo.), L. R. A. 1915B, 1091; Innerarity v. Merchants Nat. Bank, 139 Mass. 332, 52 Am. Rep. 710; Lilly v. Hamilton Bank, 179 Fed. 53, 102 C. C. A. 1, 29 L. R. A. (N. S.) 558, with note; Frenkel v. Hudson, 82 Ala. 158, 60 Am. Rep. 736; Moores v. Citizens Nat. Bank, 111 U. S. 164; Rankin v. Chase Nat. Bank, 188 U. S. 557, Wheeler v. Home Savings Bank, 188 Ill. 34, 80 Am. St. Rep. 163; Mer. Nat. Bank v. Lovit, 114 Mo. 519, 35 Am. St. Rep. 770.

The cases of the application of the exceptional rule in cases of the cashier of a bank, are collected in the notes in 29 L. R. A. (N. S.) 559, and in 49 L. R. A. (N. S.) 764.

The opinion and the note in the Brookhouse case, *supra,* point out the fact that the doubt entertained by Mr. Pomeroy (Eq. Jur. sec. 675, note 1), as to whether directors, presidents and other managing officers of a corporation, through whom alone the corporation can act, are within the exception to the general rule charging a principal with knowledge acquired by the agent, which obtains when the agent is engaged in committing an independent fraudulent act on his own account, is not supported by the authorities.

In some jurisdictions it has been said that there are at least three classes of cases of this general character in which the exceptional rule will not be applied; (1) where the interested officer is the sole representative of two corporations; (2) where the corporation benefits by the transaction; and (3) where the interested agent acts for the principal, instead of dealing with him, in which case, the presumption of communication obtains. McKenney v. Ellsworth, 165 Cali. 326; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 9 Am. St. Rep. 698; Cook v. American Tubing Co., 28 R. I. 41, 9 L. R. A. (N. S.) 193.

In the note to Brookhouse v. Union Publishing Co., *supra,* on page 994 of 2 L. R. A. (N. S.), it is said:

"The authorities, therefore, lend support to two qualifications of the exception applied in Brookhouse v. Union Pub. Co.: (1) That the exception does not apply when the officer of the corporation, though he acts for himself or a third person, is also the sole representative of the corporation in the transaction. This qualification, as applied by the cases, is not at all dependent upon the question whether or not the corporation would be benefited by the transaction as a whole, if the knowledge

possessed by its officer were held not to be chargeable to it. (2) That the exception does not apply where the corporation, if it were held not to be chargeable with notice of the fraud of its officer, would, as a result of the whole transaction, be in a better position than if the transaction had never taken place. This qualification, as applied by the cases, seems not to be dependent upon the fact whether or not the corporation was represented in the transaction solely by the officer with notice of whose fraud it is sought to be charged. In determining, for the purposes of this qualification, whether or not the corporation would be benefited by the act of its officer if the latter's knowledge were not chargeable to it, regard must be had to the transaction as a whole, and not merely to that part of it which is favorable to the corporation. For example, if a bank purchases a note from its cashier, the transaction to be regarded for the purposes of the second qualification, includes not only the transfer of the note by the cashier to the bank, but the transfer of the bank's money to the cashier.''

In the following cases where the interested cashier was the only representative of the banks in the transaction, both banks were held chargeable with the cashier's knowledge. Lowndes v. City Nat. Bank, 82 Conn. 8, 22 L. R. A. (N. S.) 408; First Nat. Bank v. New Milford, 36 Conn. 93; Morris v. Georgia L. S. & B. Co., 109 Ga. 12, 46 L. R. A. 506; Tilden v. Barnard, 43 Mich. 376, 38 Am. Rep. 197; Fishkill Sav. Inst. v. National Bank, 80 N. Y. 162, 36 Am. Rep. 595; Loring v. Brodie, 134 Mass. 453; Mer. Nat. Bank v. Tracy, 150 N. Y. 565; Emasado Farmer El. Co. v. Farmers Bank (N. D.), 127 N. W. 522; Black Hills Nat. Bank v. Kellogg, 4 S. D. 312; National Bank v. Feeney, 9 S. D. 550, 46 L. R. A. 732.

The reason for the distinction is this: In those cases where the interested officer deals with his corporation the two parties to the contract are the corporation and the individual who happens to be an officer of the corporation but is acting strictly for himself. But, where the same officer acts for both corporations, or is the sole representative of the corporation with which he deals, there being no acting officer from whom he can withhold, or to whom he can impart, his knowledge, it is necessarily his corporation's knowledge.

See note in 29 L. R. A. (N. S.) 562, for similar cases relating to other officers.

In Citizens Savings Bank v. Walden, 21 Ky. L. R. 739, 52 S. W. 953, and in Mutual Life Ins. Co. v. Chosen Friends Lodge, 29 Ky. L. R. 394, 93 S. W. 1044, relied upon by the plaintiff, the interested officer was the sole representative of the corporation; those cases thus falling within the first class above announced. For that reason they have no application here.

Crockett was not an officer of the Evansville Bank, and did not claim to be; neither did he pledge his stock to the bank of which he was cashier. In short, he was not the sole officer representing both banks, in transactions between the banks, which are prerequisites in order to prevent the operation of the exceptional rule as to notice.

From this consideration of the law and the facts of this case, we are of opinion the defendant was not liable under any view of the case, and that its motion for a peremptory instruction should have been sustained. For that reason we do not pass upon the objections to the instructions to the jury.

Judgment reversed.