23008. AMERICAN SURETY COMPANY OF NEW YORK *v.* CITIZENS BANK OF COLQUITT.

DECIDED JANUARY 31, 1934.

*John T. Goree, Martin, Martin & Snow,* for plaintiff in error.
*N. L. Stapleton, H. A. Wilkinson,* contra.

JENKINS, P. J. ■ The plaintiff bank sued the principal and the surety on the official bond of the principal as county superintendent of schools, for damage sustained by the bank from wrongful acts committed by the superintendent under color of his office. The surety company excepts to the denial of its motion for a new

trial, after a verdict and judgment in favor of the bank for the amount of its loss sustained upon a note, purporting to have been authorized by resolution of the county board of education and to have been signed by its president, but alleged to have been fraudulently certified and forged by the superintendent, on which the loss amounted to the principal of $4500, interest, attorney's fees, and costs. The law of the case, determining most of the questions raised by the general and special grounds, has been settled by the holding of the Supreme Court that the bank's petition stated a cause of action good as against the demurrers. *Citizens Bank of Colquitt* v. *American Surety Co. of N. Y.*, 174 *Ga.* 853 (164 S. E. 817), where the pleadings are stated and the substance and effect of the allegations are summarized, with these conclusions: "In these circumstances, the superintendent got these funds under improper acts committed under color of his office, and by improper performance of the duties imposed upon him by law. His bond was given not only to protect the county board of education against his improper and neglectful performance of the duties imposed upon him by law, but for the use and benefit of any person who might be injured by any improper act done by him under color of his office, or by the improper performance of the duties imposed upon him by law, due both to the county board of education and to persons having dealings with such board and himself in his official capacity. So we are of the opinion that this official bond of this county superintendent of schools became and is liable to the bank for the injury sustained by it by the false, fraudulent, and improper acts committed by this officer in getting this money from the bank under color of his office." See also the decision in a suit by the bank against the county board (*Citizens Bank of Colquitt* v. *Seminole County Board of Education*, 170 *Ga.* 654, 153 S. E. 768) ; and the decision of this court in 44 *Ga. App.* 57 (160 S. E. 546), which on certiorari was reversed by the decision first cited above.

(*a*) The contention of the defendant surety that the verdict was unauthorized because the acts of the superintendent were merely "personal malfeasance" and not done under color of his office are without merit, under the above rulings and the evidence supporting all material allegations of the petition.

(*b*) Nor is there merit in the contention, under the general grounds, that the Supreme Court's decision was based upon its

statement of the facts that the superintendent "represented that said resolution had been passed by the county board of education and entered upon the minutes of the board," and that he "certifies this as a true and correct copy of the resolution so entered upon the minutes of the board of education," but that the evidence materially varied from these allegations, in that the bank did not attempt to prove such representation, or that the resolution was ever entered on the minutes, and the evidence showed that it had not been so entered and recorded, or signed by the president of the board and the superintendent, and that the board's official seal had not been impressed. Section 82 of the act approved August 19, 1919, known as the "Code of School Laws" (Ga. L. 1919, p. 322; Michie's Code, § 1551(87)), provides that "the county school superintendent shall be ex-officio secretary of the board," and "it shall be the duty of said secretary to be present at the meetings of the board, and to record in a book, to be provided for the purpose, all their official proceedings, which shall be a public record upon the inspection of any person interested therein, and all such proceedings, when so recorded, shall be signed by the president and countersigned by the secretary." Section 95 of the act (Michie's Code, § 1551(102)) vests in the county boards of education the power to borrow money to pay for the operation of the public schools of their counties. Section 96 (Michie's Code, § 1551(103)) requires that, in order to borrow such money, "there shall be passed by said board a resolution authorizing said money to be borrowed, in which resolution it shall be stated the amount of money to be borrowed, the length of time the same is to be used, the rate of interest to be paid, and for what purpose borrowed and from whom the same is to be borrowed, which resolution shall be by the county school superintendent recorded on the minutes of the meetings of said board of education." Section 100 (Michie's Code, § 1551 (107)) provides that, "after the resolution aforesaid *has been passed* by any board of education, the president of the board of education, together with the county school superintendent, shall have the right to execute a note or notes in the name of the board of education of said county for any money that is authorized to be borrowed, under the resolution *passed* by said board of education." (Italics ours.) Neither under the statutes nor under the former decision in this case is the record on the minutes of the board of its resolution to

borrow money, nor the signing of the minutes by the president, made a mandatory or prerequisite condition to the right to borrow money and execute notes for school purposes. Such right is in terms given by the law after the resolution has been "*passed*" by the board. The record and signature of the minutes are merely for the purpose of preserving accurate and authoritative permanent records of the official proceedings of the board, as a "public record upon the inspection of any person interested therein." Nor is there any statutory requirement for the impress of the board's official seal on a certified copy of its resolution to borrow money, as a condition for such borrowing. The omission of these ministerial formalities by the superintendent did not render his alleged and proven acts beyond the "color of his office."

■ The Supreme Court further held that "there is no pretense that the bank knew of the false and fraudulent acts by which the superintendent got these funds, nor can it be set up by the surety as a matter of defense that the bank did not exercise due care in not discovering the fraud and forgery of the officer. Want of due care is no defense to the wilful misconduct of the officer for the faithful performance of whose duties the surety obligated itself." The evidence does not show any participation by the bank in the fraudulent acts of the superintendent.

■ The first five grounds of the amendment to the motion for a new trial complain of the admission of the promissory note evidencing the bank's loss, a previous similar note, copies of alleged board resolutions fraudulently certified by the superintendent, and the bank cashier's check covering the proceeds lost by the bank, upon the grounds, (*a*) that the superintendent, in issuing and presenting these papers and indorsing the check, was not acting under color of his office; (*b*) that the instruments were patent and admitted forgeries; (*c*) that they did not show compliance with the formalities stated in the first division of this decision; and (*d*) that the note and certified copies of the fraudulent resolutions preceding the loan showed on their face material alterations without explanation from the bank offering them in evidence, in that the individual name of "W. J. Bush" (president of the bank) had been stricken out and the name of the bank inserted as payee of the notes and as lender named in the resolutions. The quoted rulings of the Supreme Court and the holdings in the first two divisions

of this decision determine adversely to the defendant the first three of these grounds of objection. As to the last ground, the admitted and admissible evidence failed to show any connection with or knowledge by the bank of either the forgery of the signature or any irregularity in the changes in the names of the payee and lender, but indicated that the changes were made before the bank accepted the papers. Alterations, prima facie, are presumed to have been made prior to the execution of the paper (which technically includes both its signing and issue or delivery), unless the paper is denied under oath. *Thrasher* v. *Anderson*, 45 *Ga.* 538, 544; *Planters Bank* v. *Erwin*, 31 *Ga.* 371; *Winkles* v. *Guenther*, 98 *Ga.* 472, 474 (25 S. E. 527); *Buffington* v. *Thompson*, 98 *Ga.* 416, 422 (25 S. E. 516); *Craig* v. *National City Bank*, 26 *Ga. App.* 128 (2) (105 S. E. 632); 23 C. J. 278, 279. A note is not generally considered as issued before it comes into the hands of some one entitled to make a claim upon it. 2 C. J. 1225. Accordingly, since, as held in this case, "want of due care (by the bank) is no defense to the wilful misconduct of the officer for the faithful performance of whose duties the surety obligated itself," and since the evidence shows that the bank did not know of the forgeries, and the alterations were made before the issue or delivery of the papers to the bank, the rules stated in code section 4298, that, "if the contract is not set forth as the basis of the action, so as to require a denial on oath, an alteration in a material part requires explanation before it can be admitted as evidence," and in code section 5831 that, "if the paper appears to have been materially altered, unless it is the cause of action and no plea of non est factum is filed, the party offering it in evidence must explain the alteration, unless the paper comes from the custody of the opposite party," have no application.

■ "Where any suit is instituted or defended by a corporation, the opposite party shall not be admitted to testify in his own behalf to transactions or communications solely with a deceased or insane officer or agent of the corporation." Civil Code (1910), § 5858, par. 3 (being part of what is known as the "evidence act of 1889"). "Besides the deceased [officer or] agent of the corporation, there must be some other person present, related in some way to the corporation, before the opposite party will be competent to testify to transactions or communications had with such [officer

or] agent." *New Ware Furniture Co.* v. *Reynolds,* 16 *Ga. App.*
19 (2) (84 S. E. 491). "Under the evidence act of 1889, the
plaintiff could not testify to a conversation between himself and
the president of the bank, who had since died, unless it was *heard*
by some third person, and the burden was on the plaintiff to show
that it was." "He testified that this conversation was had in the
presence of certain clerks and directors of the bank, but did not
know that any of them *knew* what was said. The plaintiff not
showing affirmatively that any of these persons *heard and knew*
what was said between himself and the deceased, the court did not
err in holding that the conversation was inadmissible." (Italics
ours.) *Merchants Bank* v. *Demere,* 92 *Ga.* 735 (4), 740 (19 S. E.
38) ; *American Harrow Co.* v. *Dolvin,* 119 *Ga.* 186, 192 (45 S. E.
983). Grounds 6 to 13, inclusive, of the motion for a new trial
except to the exclusion, upon objections by the plaintiff, of testi-
mony of the school superintendent, a codefendant, offered by the
defendant surety, seeking to show conversations and acts between
the superintendent and the deceased president of the plaintiff
bank in making the loan in question and accepting the forged
notes and fraudulent resolutions from the superintendent, by
which the defendant sought to prove that, prior to such acceptance,
the president directed the superintendent to make the note payable
to the bank instead of to himself individually, and suggested that
the original resolution should be changed so as to delete his name
and insert the bank's name in his place as lender, and that these
changes were made by the superintendent at the president's desk
in the bank, and also sought to prove that the cashier of the bank
was present in the bank, in a large room 30 by 30 feet, and could
have heard the conversations. This excluded evidence and the ad-
mitted evidence of the superintendent and the undisputed evidence
of the cashier, however, showed that during the transactions claimed
with the deceased president, the cashier was engaged in other busi-
ness and conversations of his own with customers at a distance of
some thirty feet from the president's room, which was separated
by a partition not reaching to the ceiling, that the cashier never
entered the president's room during the transactions with the su-
perintendent, and that, according to the superintendent's evidence,
while the cashier was near enough to have heard the "ordinary con-
versational tone" used by the parties, he was "not in position to

say that [the cashier] *heard* any of the conversation between [himself] and [the president]." Under the legal rule last stated, the court did not err in excluding the proffered testimony.

■ While "independent physical facts not involving communications or transactions with deceased persons are not within the rule which would exclude one from testifying where the other party to the transactions or communications is deceased" (*Walers* v. *Wells,* 155 *Ga.* 439, 445, 117 S. E. 322, and cit.); and the evidence of the superintendent that he had originally prepared the note and resolution in controversy in a city other than that in which the bank was located did not, therefore, fall within the inhibition of the rule, it can not be held that this evidence, even if material, was of sufficient importance to have had any effect on the result of the case.

■ The court did not err in charging the jury that, if they found for the plaintiff bank, in fixing the amount of the recovery they should compute interest at 8 per cent. on the $4500 principal amount of the note from the time of its maturity, instead of allowing the plaintiff to recover only 7 per cent. interest from the date of the alleged breach of the bond sued on. While the action was on the $10,000 bond, it sought to recover as damages sustained from its breach the $4500 principal and the 8 per cent. interest provided for in the note from the date of its maturity, together with costs and attorney's fees expended by the plaintiff, as the amount of the injury actually sustained. This was proper. See *Terrell* v. *McLean,* 130 *Ga.* 633 (2) (61 S. E. 485); Civil Code (1910), § 299. It did not seek to recover interest on the amount of the bond, in which event it would have been entitled to only 7 per cent. from the date of the breach. Nor did the court err in charging that the plaintiff contended that it was entitled to recover "$1000 attorney's fees expended in this behalf," and that, if the jury should find for the plaintiff, and should find attorney's fees, they should add to the verdict, "we also find so many dollars as attorney's fees." The omission to charge, as contended by the defendant, that, "if attorney's fees were awarded, the jury should find a reasonable amount based on the evidence introduced in said case," and to charge "the proper manner of finding a verdict for attorney's fees," was not error. See *Hartford Accident Co.* v. *Young,* 40 *Ga. App.* 843 (5) (151 S. E. 680). The charge merely quoted the

allegations as to attorney's fees as laid in a paragraph of the petition, to which paragraph the defendant specially demurred, and the law of the case was fixed by the judgment overruling this with other grounds of demurrer. There was no request to charge any rule as to reasonable attorney's fees. The undisputed evidence was that $1000 would be a reasonable fee; but the verdict and judgment reduced this to $800.

*Judgment affirmed.* *Stephens and Sutton, JJ., concur.*