### Hilton's Administratrix v. Potter-Matlock Trust Company.

(Decided May 24, 1929.)

(As Modified, September 27, 1929.)

402

J. F. DENTON and R. C. P. THOMAS for appellant.

G. D. MILLIKEN for appellee.

Opinion of the Court by Drury, Commissioner—Reversing.

The appellant, Minnie F. Hilton, as administratrix of J. L. Hilton, sued the Potter-Matlock Trust Company, the former trustee of J. L. Hilton's estate, for money she alleged the trust company had caused the trust estate to lose by its negligent management of it. She was unsuccessful, hence this appeal.

It appears from this record that J. L. Hilton was somewhat mentally infirm, and the Potter-Matlock Trust Company had been, for perhaps a quarter of a century, his trustee. Just how it became such does not appear in the record. On September 28, 1921, the Potter-Matlock Trust Company loaned to J. D. Fonville $5,000 with which Fonville purchased a house on Tenth street in Bowling Green, and to secure the payment of the three bonds representing this $5,000, Fonville gave to the trust company a mortgage on this Tenth street house and on lots 84 and 85 in what is known as Cabell Garden addition to Bowling Green. The three bonds that represented this $5,000 the trust company sold to itself as trustee for Hilton. On August 19, 1922, it made to Fonville a loan of $1,250 of its own funds, and to secure the payment thereof took a second mortgage on this Tenth street house and these two Cabell Garden lots. Shortly thereafter Fonville made an assignment for the benefit of his creditors and named the Potter-Matlock Trust Company as his assignee. Shortly after that Fonville was adjudged bankrupt, but an appraisement of this mortgaged property indicated there was no surplus in it available for creditors, and the trustee in bankruptcy did not take hold of it. As assignee, the Potter-Matlock Trust Company and Fonville sold these two Cabell Garden lots to R. C. P. Thomas on February 15, 1923, for $1,250. This money the Potter-Matlock Trust Company

applied to the payment of its second mortgage debt and released both mortgages upon the Cabell Garden lots, thus leaving the three bonds that represented this $5,000 secured by the Tenth street property alone. On October 25, 1925, Minnie Hilton married J. L. Hilton. J. L. Hilton died March 16, 1926, and shortly thereafter his widow qualified as his administratrix. Litigation relative to this estate followed. The administratrix was trying to get possession of this estate, and in some of that litigation this order was entered:

"Exceptions having been filed herein by Minnie Hilton, administratrix of the estate of J. L. Hilton, to the report of settlement made herein by the Potter-Matlock Trust Company and to the report filed by Will R. Speck, commissioner, in connection with said settlement, and the court being sufficiently advised, overrules said exceptions, it is the judgment of the court and is ordered that the Potter-Matlock Trust Co. be and it is allowed the sum of $500.00 for extra services rendered the estate, and that the report of settlement and the report of the commissioner be and the same is confirmed; however, this order is not intended nor shall it be construed to preclude any further action in connection with the settlement, should the audit of the trust company's books, which is now being proposed and authorized, show there be any discrepancies or irregularities warranting further action upon the part of the administratrix of said estate."

A part of the assets turned over by the Potter-Matlock Trust Company to Minnie Hilton as administratrix was this $5,000 bunch of bonds, and on May 3, 1927, she filed a suit to foreclose that mortgage. She obtained a judgment, and the property was sold on June 27, 1927, for $3,500. After paying some back taxes, costs, etc., the net sum realized by her from this sale was $3,190.05. Thereupon she began this action against the trust company, charging it with mismanagement of this trust, with appropriating to itself the money realized from the sale of the Cabell Gardens property, and asking judgment against it for $1,950. The trust company for its defense first categorically controverted her petition and, further answering, alleged that this loss was due to her own mismanagement of this business after it came into her hands, and further pleaded that it had settled with

her, had turned over to her these bonds as representing $5,000 in money; that she had not filed any exceptions to the settlement nor had she appealed therefrom; that she had given the trust company no notice of her suit to enforce this mortgage and was now estopped from setting up and claiming any loss or damage against the trust company. It further pleaded that it had carefully managed this business and that at the time the Cabell Gardens property was sold the Tenth street property was ample security for the $5,000 loan.

By reply Mrs. Hilton controverted everything contained in the trust company's answer. That this estate was mismanaged is evident to the proverbial wayfaring man. One of the first questions is, who is to blame for it? The greater part of the proof filed on behalf of both the administratrix and the trust company and the greater part of the argument in the briefs is devoted to an effort to fix the blame for this negligence. Each is trying to thrust it upon the other. The administratrix cannot be blamed for this. She did not cause this loss. She was not negligent. All she did was to endeavor to collect these bonds, and she did that at the first available court after she got possession of them. The trust company argues in its brief that it was this action on her part that caused the loss. It argues that she should have waited and should have endeavored to sell this property privately; but the administratrix here is acting in a fiduciary capacity. She must administer this estate. The heirs and creditors of J. L. Hilton were entitled to have this estate administered and distributed. The suggestion that she could have sold this privately is utterly without merit, for the title was not in the administratrix, it was in Fonville, and there is nothing to indicate that she could have induced him to cooperate with her. For that and other reasons that could be cited the conduct of the administratrix is approved. The trust company argues that she accepted these bonds as $5,000 in cash. It made that allegation in its answer. She controverted it by reply. The proof is silent on the subject. The trust company relies on the order copied above as establishing this, but we are unable to spell that out of this order. On the contrary, a careful consideration of this order leads us to the conclusion that it shows the contrary, and it is our judgment that she never accepted these bonds as cash or its equivalent. She was entitled to the possession of them. They should have been collected, and she should

have been able to collect thereon the face value thereof. She was not able to do so, and the trust company must be held responsible therefor, as this failure to collect was due to its negligence. We are unable to see anything in any of the acts or conduct of the administratrix to estop her as such from proceeding against this trustee. This estate has suffered from somebody's negligence. This is a controversy between two fiduciaries. We are interested in seeing that the estate does not suffer by negligence. We have found one of these fiduciaries was not negligent. We shall now consider the evidence as to whether or not the other one was.

When the loan was first made, Hilton had just bought this house and had paid therefor $5,000, yet this trust company loaned $5,000 upon the security of this house and two other lots which the proof seems to show were worth $1,250. It loaned $5,000 upon $6,250 worth of security. In other words, it loaned 80 per cent. of the value of the property. This appears to us to be meager security. The trust company contends that Fonville was going to spend some money on the property, but there is no evidence that he did so. He testified that he had made some repairs and would file a statement showing what he had made, but he did not file it.

Twelve months after this, the trust company made to Fonville a second loan of $1,250 and took a second mortgage. That was an indication to the trust company that Fonville's financial affairs were not in good condition; it was another notice of danger. The trust company alleged that when it made this loan Fonville was worth, according to the argument in its brief, $24,000; yet shortly after making this second loan, Fonville made an assignment for the benefit of his creditors—more notice of danger. When this estate was appraised in these assignment proceedings, it was found that the incumbrances on this property were so large there was no surplus for the benefit of creditors.

Fonville was forced into bankruptcy, and again it was found there was no surplus for creditors. On February 15, 1923, the trust company and Fonville sold the Cabell Garden lots for $1,250, and the trust company was careful to see that its debt was paid, although the Hilton bonds were first liens on the property, and it then released, not only its lien on the Cabell Gardens lots, but, as trustee of Hilton, released the Hilton lien on these lots.

This was negligence. Fonville failed to pay his interest promptly in March, 1924, and did not pay it for almost three months. He failed to pay his interest in September, 1924, and did not pay that until it was about six months overdue. The trust company allowed him to go nearly two months before paying his interest due in March, 1925. The interest due in September, 1925, on two of these bonds was not paid until it was nine months overdue. On the other bond he never did fully pay the interest due in September, 1925. He did not pay his interest in March, 1926, or in September, 1926, and the interest of March, 1927, was due and unpaid at the time the trust company alleges it made a settlement with the administratrix. Although this record fairly bristled with danger signs, the trust company complacently went on its way and did nothing. During this period the post-war deflation was going on; the trust company was having, so its cashier testified, more foreclosures than it had ever had before. Yet it did nothing. In the handling of trust funds trust companies claim to possess superior knowledge; the preservation of estates is their speciality; watchfulness is supposed to be their stock in trade. This one, instead of being watchful, was negligent in the face of repeated warnings.

Now, concerning what this property was worth when it was sold, this is the evidence: It sold for $3,500 at public outcry after due advertisement. The two men who appraised it for the purpose of the sale fixed its value at $4,000. An asphalt street had been recently built in front of the property. The master commissioner that made this sale had gone through the property with a friend of his who wanted to purchase some property, and he fixed the value at $4,000. One of the appraisers had gone through and made an examination of the property. The other appraiser lived in a neighboring block and was well acquainted with its value. Judge Sims, who bought the property for $3,500, kept it for a year, and, after making some improvements on it, sold it for $5,000. He gave his deposition on June 5, 1928, and testified that the property was then reasonably worth $5,000 or $6,000. He said he regarded the property as a bargain when he bought it, but he does not say how much of a bargain. He does not say how much he spent on it and does not attempt to say what the property was worth when he bought it. Mr. Hunley, a real estate man, said the property in June, 1928, was worth about $5,500. He does not say what it was worth in June, 1927, when it

was sold. He said that Judge Sims had recently sold it for $5,000, but admits that Judge Sims had spent some money on it, had kept it a year, had rescreened it, had had some plumbing work done and other repairs made, and testified that, considering the repairs made, Judge Sims did not make very much out of the property. Mr. Gardner, another real estate man, said of the property that the sale would, to a great extent, establish the value of the property. It was evident that he was talking about the sale recently made by Judge Sims when he sold the property for $5,000; but he does not pretend to say what the property was worth in June, 1927, nor does he pretend to say how much Judge Sims had expended on it in order to enable him to sell it for $5,000. The evidence wholly fails to show that this property was worth any more than $3,500 in June, 1927. On the date of this sale, these bonds and the interest on them amounted to $5,579.50. There were some street improvement liens on the property, some taxes, some water rent, and other charges. If the trust company had carefully and prudently managed this estate it would have had these funds so secured that when the security was sold it would have brought sufficient to pay the bonds. Fonville was living in the house. He was anxious to remain. He endeavored to get friends to assist him in buying the property, but was unable to do so.

This administratrix sued and alleged that through the negligence of this trust company the trust estate had lost $1,950. She has fully proven the loss, but in order to recover she must go further; she must by proof fasten upon the trust company the responsibility therefor. This she has only partially done. As to the $1,250, for which the Cabell Gardens property was sold she has succeeded, but not as to the $450 of interest, for loss of which she seeks to hold it responsible. She shows the loss of that, but there her proof stops. She contends the trust company should have coerced the payment of this when due, but fails to establish by proof what would have been the result of such coercion. So far as this record shows, such coercion might have resulted in a sale of this property in the most acute period of post-war deflation, and have resulted in greater loss than was finally sustained. Sometimes it is wise not to coerce a struggling debtor, and this appears to have been such a case. Mrs. Hilton did not prove it was not, and in her brief she has abandoned that part of her claim.

Judgment reversed, with direction to award the administratix a judgment against the trust company for $1,250, with interest from February 15, 1923, the date it received this money.