# People's State Bank & Trust Co. et al. v. Wade.

(Decided Jan. 15, 1937.)

RICHARD PRIEST DIETZMAN and MARCUS C. REDWINE for appellants.

W. L. KASH for appellee.

OPINION OF THE COURT BY JUDGE STITES—Reversing.

This is a suit to surcharge the settlement made by the appellant . People's Bank & Trust Company as guardian for the appellee, Stanley D. Wade, who became of age in January, 1935. While serving as guardian, appellant purchased a $1,000 first-mortgage 6 per cent. real estate bond of the Drake Towers Building Corporation in Chicago and a $1,000 first-mortgage 6½ per cent. real estate bond of the Mount Hope Bridge Company in Rhode Island. Both purchases were made in February, 1928, and each has turned out to be a very bad investment, resulting in a loss to the ward's estate. It is not claimed that appellant was guilty of any bad faith in making the two purchases, but it is insisted neither investment is such as an ordinarily prudent businessman would make in similar circumstances and that each investment was in violation

of section 2043 and section 4706 (since amended) of the Kentucky Statutes 1930. It is asserted that, because of the violation of the Statutes, the guardian must bear all losses that have occurred, even though we should conclude that he otherwise acted prudently in making the original purchase of the bonds. The chancellor found in favor of the ward, and this appeal followed.

A guardian, like any other trustee, is under a duty to exercise the care and judgment of an ordinarily prudent businessman in the making of investments of trust funds, having always in mind, of course, any limitations or directions contained in the instrument creating the trust, as well as the purposes which the trust is designed to accomplish. The two usual purposes for the creation of a trust are (1) to preserve the property intact, and (2) to earn an income for the beneficiary. In either event, the purpose of setting up a trustee to administer a fund or estate is to substitute the supposedly superior judgment of the trustee for that of the beneficiary. It is not expected that the trustee shall "bury his talents," nor is the law such a hard master as to require that he exercise an infallible judgment in the investment of funds entrusted to his care. He must exercise the skill and judgment of a reasonably prudent businessman in preserving the estate, but at the same time make the estate productive. The tests by which a trustee should ordinarily measure the advisability of a particular investment are thus stated in the Restatement of the Law of Trusts, vol. 1, sec. 227, subsec. (m):

> "Among the matters which the trustee should consider in selecting a given investment, in addition to those relating to the safety of the fund invested and the amount and regularity of the income, are: [1] the marketability of the particular investment; [2] the length of the term of the investment, for example, the maturity date, if any, the callability or redeemability, if any; [3] the probable duration of the trust; [4] the probable condition of the market with respect to the value of the particular investment at the termination of the trust especially if at the termination of the trust the investment must be converted into money for the purpose of distribution; [5] the probable condition of the market with respect to reinvest-

ment at the time when the particular investment matures; [6] the aggregate value of the trust estate and the nature of the other investments; [7] the requirements of the beneficiary or beneficiaries, particularly with respect to the amount of the income; [8] the other assets of the beneficiary or beneficiaries including earning capacity; [9] the effect of the investment in increasing or diminishing liability for taxes.''

In addition to the above, it may be added that the trustee should consider the advisability of diversifying his investments in order to insure against adverse conditions in any particular field.

It is argued for the appellee that the guardian might have invested in various government securities or have made loans on local real estate at the time when these two bonds were purchased. If these were the only types of securities purchased by prudent businessmen, there might be some force in this argument. It is common knowledge, of course, that prudent businessmen do not confine their investments to these types of securities alone. Also, at the time that the investments were made, government bonds were yielding a very low income, and it is affirmatively shown that loans on local real estate were practically at a standstill and that no desirable ones were available. Indeed, we may well assume, in the light of subsequent experience, that such loans would have fared no better than those that were actually made.

The liability of a trustee does not arise from the mere fact of a loss to the estate, in the absence of the violation of some statutory inhibition. It arises, if at all, from a failure to exercise the judgment of a prudent businessman investing funds of his own or of others. To this degree of care he is accountable. It is shown in the record before us that the investments were apparently sound and well secured, that prudent businessmen were buying the securities, and that there was nothing which the guardian knew, or should or could have discovered, to put him on notice of the danger of loss. In testing his obligation, we must measure his judgment in the light of the information available to him at the time when he made the investment and, so far as possible, place ourselves in his position at the time, in order to determine whether or not, under all

the circumstances, he exercised the judgment of a prudent businessman. We cannot apply "hindsight" as a criterion. Examined in the light of conditions existing when these investments were made, we are bound to conclude that the guardian exercised the care of a prudent businessman.

As set out above, it is insisted, however, that the appellants' liability became that of an insurer because of its failure to comply with the alleged requirements of section 2043 of the Statutes and of section 4706 as it existed prior to its amendment by chapter 91 of the Acts of 1932.

It is provided by section 2043 that resident guardians shall not remove any of the property of their wards out of the state without first obtaining the sanction of a court of chancery jurisdiction in the county in which the guardian was qualified. In Lyne v. Perrin's Adm'r, 97 Ky. 738, 31 S. W. 869, 17 Ky. Law Rep. 504, followed in Selph v. Burton's Adm'r, 68 S. W. 407, 408, 24 Ky. Law Rep. 310, it was held that the lending of a part of the estate of a ward to a nonresident was in effect a removal of the ward's property in violation of this statute. The court said:

"The policy of the law was to keep the property of their ward within the jurisdiction of the court, that the rights of wards may be protected and their property preserved. This section has reference to notes, bonds, money, personal property; in fact every species of property which may lawfully come to the hands of a guardian."

While the ultimate decision in the Lyne Case and in the Selph Case may have been correct, and the guardians in each of those cases may have failed to exercise that degree of prudent judgment in the investment of the estate of their wards which the law requires, it seems to us that the decision in neither case should have been placed on the provisions of section 2043 of the Statutes. It may be bad judgment to lend a ward's money to a non-resident where the collection of the debt would entail the expense of going to a foreign jurisdiction or trailing a wandering debtor to secure the amount due. Certainly, however, this is not "removing" the property of the ward from this jurisdiction. While the guardian may thus change the

form of the estate by substituting a credit in lieu of his ward's cash, or may switch from a bank credit to an individual credit, the estate itself in this jurisdiction is in no way diminished by the change in form from one species of property to another. A credit is no less ''property'' than so much cash. An examination of the myriad decisions on the taxation of credits as property at the residence of the creditor should be a sufficient indication of the truth of this conclusion. In the light of modern business practices and the more recent decisions of this and other courts, it is obvious that the construction placed on section 2043 by the decisions in the Lyne and Selph Cases is unsound. In order to avoid any question of our attitude in the matter in the future, those cases, in so far as they undertake to construe section 2043, are expressly overruled.

It follows from what we have said that the appellee is incorrect in his contention that the purchase of first-mortgage bonds secured by real estate outside of this jurisdiction is per se improper or that the guardian is thereby made an insurer of the collection of the par value of the bonds.

Section 4706 of the Statutes, as it existed at the time that the investments here complained of were made, in so far as it is pertinent here, provided:

"That it shall be lawful for persons or corporations holding funds in a fiduciary capacity for loan or investment, to invest the same in real estate, mortgage notes or bonds or in such other interest bearing or dividend paying securities as are regarded by prudent business men as safe investments, and to make loans with such securities as collateral; but such funds shall not be invested in the bonds or securities of any railroad or other corporation unless such railroad or other corporation has been in operation more than ten years, and during that time has not defaulted in the payment of principal or interest on its bonded debt."

It is contended that, since neither the Drake Tower Building Corporation nor the Mount Hope Bridge Company had had a corporate existence for ten years prior to the time when these investments were made, it was a violation of section 4706 to purchase the first-mortgage real estate bonds of either corporation. It is

claimed by the appellant that the prohibition against the investment in bonds or securities of a corporation that had not been in operation for ten years has reference to the type of bonds and securities known to the financial world in 1892, when section 4706 was first enacted. At that time substantially the only bonds of corporations in which fiduciary funds were invested were railroad bonds or turnpike road bonds. Industrials and public utilities, as now recognized, had not made their appearance to any material extent. It is true that stocks in corporations were a common medium for investment even then. The railroad bonds in 1892, just as today, were many and varied in character—the general mortgage bond, the income bond, the refunding bond, the equipment bond, even the debenture bond. None of these was strictly what we now recognize as a real estate mortgage bond or note.

If the railroad became insolvent, it had to go through a receivership or reorganization because it was not feasible to sell the rolling stock or equipment apart from the roadbed or franchise or the latter apart from the rolling stock or equipment. The whole must be disposed of as a going concern if utter sacrifice was to be avoided. Because of these problems of receivership or reorganization, the bonds of such companies were too hazardous for the investment of trust funds unless ten years of successful operation vouchsafed for the future and reduced the danger of a default in the payment of interest or dividends. The same generalization was applicable to the stock of ordinary commercial corporations. Such stock must have a dividend paying record before it was considered sufficiently conservative for trust money. It is argued, therefore, that the "bonds and securities" found under the ten-year provision of section 4706 were not intended to and did not embrace a real estate mortgage note or bond even though executed by a corporation.

Certainly it could hardly be within the reason or purpose of the statute to say that a trustee could lawfully purchase a piece of real estate with trust money but could not make a loan with that same real estate as collateral if the borrower happened to be a corporation, even though the obligation would thus be secured not only by the value of the real estate but also by the credit of the corporation. "In construing a statute

the intention and meaning of the Legislature must be ascertained and given effect from an examination of the whole act and the reason and spirit of the law must be considered. If it can fairly be done, a statute must be so construed as to accomplish the purpose for which it was intended.'' Mann v. Humphrey's Adm'r, 257 Ky. 647, 79 S. W. (2d) 17, 19, 96 A. L. R. 584. By the same token it should not be construed to accomplish a result not intended.

We are asked here to hold a trustee responsible as an insurer for an alleged violation of a statute, although there is obviously no causal connection between the alleged breach of a statutory duty and the ensuing loss. The tendency of modern decisions has been away from so harsh a doctrine as applied to an innocent trustee. Chapter House Circle, etc. v. Hartford National Bank & Trust Co., 121 Conn. 558, 186 A. 543; In re Guthrie's Estate, 320 Pa. 530, 182 A. 248, 103 A. L. R. 1186. Certainly we should not extend the wording of the statute before us beyond its plain purpose in order to accomplish so inequitable a result in the absence of language in the statute so plain as to admit of no doubt.

Experience has demonstrated that the soundness of a real estate mortgage bond depends upon the property back of it and not upon the adventitious circumstance that the borrower is an individual instead of a corporation. We conclude, therefore, that the species of investments here involved were not intended to be and were not proscribed.

Appellee does not dispute the correctness of this construction of the statute. He argues, however, that the investment in the Drake Towers bond and the Mount Hope bridge bond was improper even under this construction of the statute, for the reason that neither the Drake Towers building nor the Mount Hope bridge was built at the time when the investment was made and that there was therefore nothing other than the land on which the structures were to be placed back of the bonds at the time of the investment, and that the purchase therefore fell within that class of inhibited investments where the security was simply the credit of a corporation which had not been in existence for ten years. This argument overlooks the very purpose of the trust indenture under which the bonds were is-

sued and the duties of the trustee in connection with the issuance of bonds on any project. If we should sustain appellee's construction of the statute, it would prohibit a trustee from ever participating in an original issue of corporate real estate mortgage bonds, when he might do so with safety and with great profit to the estate which he is administering. Furthermore, the money advanced was not delivered directly to the debtor corporation but to the trustee for the bondholders. The exact terms of the trust indentures are not before us, but we may assume that they were in accord with customary business practices. The land was always in lien to secure the bonds. Every piece of material placed on the property passed likewise under the shelter of the mortgage. When we consider the original value of the land, it seems clear that there was necessarily at all times during construction a real estate value back of the bonds amply in excess of the amount advanced to the corporation by the trustee. As to the amount still in the hands of the trustee, the guardian had not only the security of the property, but also the credit of the trustee and its obligations under the trust. We conclude, therefore, that the statute is not open to the construction thus sought to be placed on it.

It is also argued for the appellants that neither the Drake Towers bond nor the Mount Hope bridge bond defaulted or materially shrank in value until after the Legislature amended section 4706 of the statutes by eliminating the inhibition against investing in the securities of a railroad or other corporation which had not been in existence for ten years. While the default on the Drake Towers bond did not occur until after the amendment became effective, this is not true of the Mount Hope bridge bond which defaulted in 1931. In view of this amendment to the statute before the loss occurred on the Drake Towers bond, it is probably immaterial whether or not the original investment was improper. "If the trustee has invested trust money in an unauthorized security, the investment may become authorized before it finally depreciates in value. Although there is no less causal connection between the improper investment and the loss, the trustee is nevertheless excused from any liability." 50 Harvard Law Review, 319 (and authorities there cited). In view of the conclusion we have reached in regard to the proper

construction of section 4706 as it stood prior to the 1932 amendment, however, it is unnecessary for us further to discuss this question.

Judgment reversed.

Whole court sitting.