## Security Trust Co. v. Appleton et al.

June 21, 1946.

As Corrected on Denial of Rehearing, November 19, 1946.

Hunt, Kessinger & Lisle, Wilson & Harbison and Samuel M. Wilson for appellant.

Frank S. Ginocchio and S. S. Yantis for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appeal is from a judgment holding appellant, Trustee, liable for the value of certain stock which became worthless. There is little dispute as to facts, but sharp disagreement as to the application of the law. J. W. Appleton died in 1910; among trusts created by his will was one to his son for life, with remainder. Appellant qualified as executor and held the estate intact until 1918, when it qualified as trustee for Bert Appleton and his children, then distributing the estate. The trust bequests to appellees were $9,000, and a one-third interest in a $30,000 fund after the death of Bert's mother, who had died prior to 1918. The estate being insufficient to satisfy legacies in full reduced the trust here involved to $16,625. The distributable sum was made up of cash, stocks to the amount of $6,275, and 46 shares of the stock of the Fayette National Bank, (hereinafter called Bank) of the value of $225 per share, and were part of 309 shares owned by testator at the time of his death.

The Trustee thereafter made periodical settlements in 1921, 1923, 1926, 1929, and 1932, admitted by appellees to have been "fairly regular settlements" to which no exceptions were filed. No settlement followed until in June,

1937, when appellees by motion required the Trustee to report, and it filed a settlement which contained this credit item: "Feb. 26, 1934. Forty-six shares Fayette Nat. Bank stock, written off at its carrying value; all the assets of the Fayette Nat. Bank having been sold and transferred to First National Bank and Trust Company in consideration of the assumption by the latter of the liabilities of the former—$10,350."

What resulted in this loss, as claimed by appellant, was the culmination of the financial flurry which began in the latter part of 1929 and progressed steadily. In November of 1930 the Louisville National Bank of Kentucky failed. This affected many banks in many sections of Kentucky. On February 2, 1931, the Lexington Guaranty Bank and Trust Co. closed, creating a run on Lexington banks. In April a national bank officer called a meeting of Bank's directors, and at that meeting criticized certain excessive loans, and demanded immediate corrective measures. Negotiations were begun and carried on for a month or more, resulting in a contract of sale of bank's assets to the First National Bank, in consideration of its assumption of the former's liabilities.

Following the filing of the 1937 report appellees filed many exceptions. The court referred the matter to a commissioner who heard proof and arguments. These exceptions, as to loss of the value of the stock, embodied the charge that the Trustee had by its mismanagement and negligence failed to protect the interests of the beneficiaries and a charge of bad faith and self-dealing. It was charged that appellant used the bank stock to advance its interest, and interests of some of its directors who voted the stock to elect themselves officers and directors of the bank, and thereby reaped financial benefits. That appellant held and controlled in fiducial capacity 692 of the total 3,000 shares of the bank, giving it power which it used to place Trustee in charge of the bank, and its directors had continued to elect one of its directors (Bassett) as president, and another (Warren) as cashier; that through this executive control Trustee dominated the affairs of the bank, a competitor, so as to enhance its banking and trust business, thus creating a position in which the interests of the two were in conflict with the Trustee's loyalty in thought and action.

That it advertised itself as a professional trustee more skilled in handling trust estates than the ordinary trustee.

Specifying, it was charged that the directors of Trustee, officers of the bank, made imprudent and excessive loans to themselves, relatives, friends and others for speculative purposes, some loans being disproportionate to financial worth. It was also charged that Trustee failed to use prudence by retaining so great an amount of the bank's stock as a trust investment; that in exercise of reasonable care it should have diversified this investment. The charge of bad faith was that Trustee had bought other stocks of a doubtful quality, and transferred them to the trust at a profit.

The commissioner recommended that all exceptions of appellees be overruled, except as to an item of costs. Appellees filed exceptions which the county court overruled and confirmed the report of the commissioner; they then prosecuted appeal to the circuit court, where by agreement the matter was submitted upon the transcript built up in the county court. The only contention presented here arose over the non-activities of Trustee in respect of the bank stock. Appellees in brief epitomize their contentions thusly: "(1) That because of the identity of three directors of the Trust Company with three of the bank, Trustee is to be charged with knowledge of a complicity in all the alleged mismanagement of the bank, hence with responsibility for actual wrong growing out of conduct of the bank; and (2) that with actual or imputed knowledge of the alleged irregularities in the conduct, it was the absolute duty of the Trustee to sell stock and reinvest in other gilt edge securities, and that having failed to do this in time to prevent loss, the Trustee is liable for ensuing depreciation of the stock."

In his judgment the chancellor overruled all exceptions, except the two substantially set out above, and held the Trustee liable for the original value of the stock, with interest, and ordered judgment certified to the county court with directions to sustain appellee's above stated exceptions, and to charge Trustee in accordance with his judgment. This brings up the appeal.

The chancellor in a comprehensive opinion rested his decision on two phases: (1) That the bank was liable because of negligence or mismanagement; (2) in part be-

cause of failure of Trustee to diversify the investment. The chancellor rather based (2) on what was said in Bryan v. Security Trust Co., 296 Ky. 95, 96, 176 S. W. 2d 104, and in People's State Bank and Trust Co. v. Wade, 269 Ky. 89, 106 S. W. 2d 74, 76. There, after setting out the tests by which a trustee should measure his duties, quoting from Restatement of the Law of Trusts, Vol. 1, p. 277, the opinion said: "In addition to the above, it may be added that the trustee should consider the advisability of diversifying his investments in order to insure against adverse conditions in any particular field." We note that the commentator in Re Saeger's Estate, 340 Pa. 73, 16 A. 2d 19, 131 A. L. R. 1152 suggested that the question of diversification was not involved in the case. It is true as the chancellor said, that the trend of judicial decisions, and as expressed by text writers, has been to hold trustees to a stricter account and to require diversification when the facts warrant the conclusion. A reference to cases noted in Re Saeger's Estate, supra, will show a conflict of opinion, and as noted the duty, if one, is merely an application of the general rule as to the care required of a trustee in making investments, and whether it exists depends largely on circumstances. In Re Adriance's Estate, 145 Misc. 345, 260 N. Y. S. 173, 181, the court said: "It is entirely true that many financial authorities advocate wide diversity of investment. It is equally true that others as strenuously affirm the contrary, * * *. This divergence of sentiment among the financial authorities would render a judicial decision in favor of either school of thought an ultrahazardous undertaking." We are not, under the circumstances here, inclined to hold liability on the ground of failure to diversify, even to the extent of concluding that the failure is to be considered in connection with the more serious charges, or as in anywise contributing to the loss.

Appellees treat the holding of the stock as an investment. It was not such in the true sense of the word as used in applicable statutes. If it were such in anywise, it was only because Trustee held in its hands from the date of testator's death till 1918 the 46 shares in the bank in which he had been an officer, and it may be assumed that he thought highly of the stock. These 46 shares were merely transferred from the estate to the

trust fund, as testator likely would have had it done. From that time until the break this stock paid dividends, and according to testimony of some witnesses the bank was considered one of the city's safest institutions, and this stock considered high type and one of the best yielding investments. It would be a waste of space and time to discuss a failure to sell and reinvest after the Trustee, according to appellant had, or should have had, knowledge of the critical condition of the bank.

The question now approached turns on the application of law to the facts developed in a mass of testimony, augmented by pages of exhibits, bank statements, records, advertisements, etc., discussed and explained in more than 200 pages of briefs. One of the exceptions filed, discussed by appellees, related to a transaction in which Trustee invested trust funds in what appeared to be improper, (Phoenix Hotel Company and Lexington Mills) stocks. In these transactions there was an element of self-profit, in the manner shown in Bryan v. Security Trust Co., 296 Ky. 95, 176 S. W. 2d 104, where in dealing with the Mill stock we held the transaction not to have been in the utmost good faith and directed rescission and accounting. It is shown that thirty days after the July settlement Trustee "took out the two stocks, and placed cash in their stead." The chancellor did not at any length deal with this exception, stating that "the only one with which we are now concerned is the exception to the credit taken for the 46 shares charged off as a loss." Apparently the court did not permit this transaction to influence his decision to any extent, since he confined liability to the failure to diversify, and negligence, principally in failing to investigate carefully the affairs of the bank, holding that its collapse was not caused primarily by the existing depression, but because of negligent financial management, the depression being only the immediate cause, saying that "the Trustee knew, or by the exercise of ordinary care could have known this, and is, therefore, charged with knowledge that such condition existed." We take this last expression to be the crux of the case, since we note that the chancellor did not find evidence of "gross negligence or fraud or bad faith."

As we look to the record we fail to find proof which would lead to the conclusion that aside from the officers

of the Bank, who were also connected in official capacities with Trustee, the Trustee as such, or officers in control of its affairs, had knowledge of the mismanagement of the Bank prior to the examination by the Government official; Mr. Manning, President of Trustee, and whose integrity is not questioned, testified that he first learned of trouble in the management of the Bank, only two days prior to the date of the taking over by the First National; that prior to that time there was nothing, so far as he or the public was concerned, which led him to anticipate a failure of the bank. It does appear that in January of 1931, one of the directors of the bank had told Manning that he had resigned and sold his stock, because he was dissatisfied with the way Bassett (director in the Trust Company) was conducting the bank. It is shown in the record that Bassett and Warren managed the affairs of the bank, and through their management large loans were made to relatives, friends and others on what is now called ''doubtful collateral,'' though which at the times the loans were made for speculative purposes, were considered good by many conservative banking institutions. It is nowhere shown that these two, with their co-director in both institutions, Mr. Goodwin, ever informed the Trustee of the way in which the bank was being managed, or was loaning its money in the manner and to the extent manifested.

It is pointed out that Mr. Manning showed little interest in the affairs of the bank, even after he had knowledge that there was a rift in the bank's family. It is noticeable.that none of the other twelve or thirteen directors of the bank communicated with Mr. Manning, or any of Trustee's directors, or advertised the situation to the public. It may be conceived that the officers of Trustee, who believed in the good qualities of a bank which had operated successfully since its institution (1870), and who may have had this information, believed that it might weather the storm. However, after all, any movement, advisory, suggestive, legal or otherwise on the part of Mr. Manning or the officers of Trustee, would not have resulted in a saving of this block of stock. No better plan for salvage, whether worked out at the instance of Trustee, or appellee, than was finally developed at the meeting which evolved the plan of transfer when were present the directorate of the bank, members of

the local Clearing House Association, together with the representatives of the Federal Government, who approved the plan. We are pointed to nothing that Mr. Manning, or his directorate, could have done toward building up the value of the stock in question. Neither does appellee point to anything the liquidating committee of the bank, made up of five active business men, apparently having the confidence of the public, could have done toward salvage. The criticism of these men was that they were heavily indebted to the bank. This would hardly charge them with ulterior motives, or the exercise of bad faith. The record shows by an audit made in the early part of 1933 that there were losses on notes of three members of the advisory committee. This showed the status of the loans as of the date of termination of the liquidating contract, first brought to the attention of the Trust Company's directors in April 1933. The first criticism of certain loans was brought to the attention of some officer or officers of the bank following a report of a bank examiner, and a meeting of the Clearing House. Prior to this time the record fails to show that the Trust officers knew anything about the quality of these notes, and it is to be gathered from the proof that the losses to a great extent were due to a rapid and unavoidable shrinkage of collaterals during a critical period.

Admitting for the purpose of argument, that the Trustee voted these 46 shares together with its holdings as Trustee, more than 650 shares, to elect, of the bank's fifteen directors, the four of its directors, three of whom were continued to be elected; that the bank, through the bad management of its president and cashier, directors of Trustee, had made improvident loans, to an extent not considered good banking, with doubtful collateral and for speculative purposes, do these facts show negligence or bad faith on the part of the Trustee? Eliminating the question of bad faith as did the chancellor, they would only constitute negligence if the facts were known to the Trustee, or by the exercise of ordinary care should have been so known. Stated in a broader sense, could knowledge of the condition of the bank, critical as it was, be charged to Trustee in the absence of actual or imputed knowledge?

We did say in the Bryan case that a trustee having means and a duty to ascertain actual value of a corpora-

tion's securities in which such company, one was corporation's president, could not rely on the general reputation of the corporation's solvency to absolve itself from liability for loss, particularly where the Trustee failed to dispose of securities after it became apparent that the investment was improper, or becoming improper. That opinion quotes what Restatement of Law, Trusts, 174, said was the rule, which may be admitted to be sound: "* * * as to the duties of a trustee with respect to investing funds and otherwise handling the estate is (that) the trustee is under a duty to the beneficiary in (the administration) of the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property. (296 Ky. 95, 176 S. W. 2d 110.)" This, so far, recognizes the rule heretofore adopted and repeated by our court in Cromie v. Bull, 81 Ky. 646; Eaker v. Husbands, 263 Ky. 283, 92 S. W. 2d 43; Cooper v. Ensor, 270 Ky. 670, 110 S. W. 2d 461; United States & Fidelity Guaranty Co. v. Drinkard, 250 Ky. 695, 63 S. W. 2d 916; 65 C. J. Trusts, p. 795. However, these words were added: "And if the trustee has greater skill than that if a man of ordinary prudence, he is under a duty to exercise such skill."

It is pointed out and it is true that by advertisements Trustee did hold out to the public, in the way of sales talk or "blowing its own horn," its skill and ability in fiducial matters. It cannot be said that even if it failed to measure up to the standard set by itself, it was under the circumstances here, charged with gross negligence. This argument is advanced through appellee's brief in support of its charge that Trustee was negligent in failing to sell the particular stock after it had knowledge that its value was imperiled; that it was no doubt the duty of the Trustee to examine and inquire throughout the existence of the trust to ascertain if investments are legal and proper. All this is true, but the answer is that up to the time when this stock became of little or no value, no one questioned its quality. When that happened, through no known or shown to be known fault of Trustee, all its self appraised skill and ability could not have relieved the situation.

There did not appear to have been either in the Bryan case or Hilton's Adm'x v. Potter Matlock Trust Co., 230 Ky. 401, 19 S. W. 2d 1088, 1090, necessity for the

invocation of the "skill" rule. In the one it was an act of the Trustee in bad faith in the sale of its property to the trust at a profit, and of stock, which, as is intimated, was an improper investment. The facts in the Hilton case showed that the Trustee had bought mortgage bonds and sold them to itself as Trustee. It had loaned money to the issuer of the mortgage bonds, who had made an assignment, and was later adjudged a bankrupt. The opinion sets out the various matters which put the Trustee on notice of the poor quality of the securities, to such an extent as justified us in saying the "record fairly bristled with danger signs," yet it, the Trustee, "did nothing." The two cases may be distinguished from the instant one; here there is no showing of a lack of good faith, actual knowledge of any existing fact that would have increased the duty of Trustee further than the exercise of ordinary care, or charged it with a higher duty because it claimed that it had uncanny skill.

We find no proof which would lead to the conclusion that Trustee had previous knowledge of the alleged mismanagement of the assets of the bank, save by those of its directors who served as officers of the bank. It is not shown that they advised any of the Trust officers further than as to the conduct of Mr. Bassett and Mr. Warren in making the improvident loans, so the matter boils down to the legal question of whether the knowledge of the officers was or is to be imputed to Trustee. On this point appellee cites Bryan v. Security Trust Co., 296 Ky. 95, 176 S. W. 2d 104, 110, and Germania Safety Vault & Trust Co. v. Driskill, Ky., 66 S. W. 610, 23 Ky. Law Rep. 2050, the latter quoted in the former. In the Bryan case it appeared that the president of the Company, which had sold to the Trustee, was also a director of the Trust Company. In speaking of the transaction in the Bryan case, where we found bad faith on the part of the Trustee, we said, quoting from the Driskill case: " 'The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and if the trustee has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill as he has.' "

We do not think the excerpt from the Driskill case, quoted above, is applicable here, nor was it so in the

Bryan case. It was unnecessary in the Driskill case to go to the extent of elaborating on the question of imputed knowledge. There an administrator had deposited estate funds in a bank which failed, to the loss of the estate. We held the trustee liable, but it does not appear to have been by reason of imputed knowledge. We said (66 S. W. 611): "The record discloses that the president of the bank, who was also president of the trust company, knew that these funds were deposited in that bank, and knew that the bank was unsafe. He was actively and daily engaged in the active management of the affairs of the two institutions. (In addition it appeared that) there were rumors generally astir in that community, and particularly within financial circles, affecting the integrity of the bank, before and during the time of these deposits. * * * Besides, the president of the trust company had actual knowledge of the faulty condition of the bank." There may have been more reason for suggesting the principles of implied or imputed knowledge in the Bryan case, yet it was not of controlling importance, since the questions upon which liability then turned, were (296 Ky. 95, 176 S. W. 2d 107): "Was the transaction so tainted with self-dealing and personal interest of a character that requires a judgment of rescission or repudiation ab initio? If not were the original investments imprudent and unauthorized?"

In the Bryan case the Trust Company and the bank were joint underwriters of the issue of the stock; the Trust Company had actual knowledge of the stock status, but the gravamen there was the self-profit making deal with trust money. We have nothing like that situation here; no situation which created a conflict of interests, or tending to interfere with the exercise of a disinterested judgment.

There is ample proof that there was mismanagement of the bank in making loans and in the manner of making loans. Mr. Manning did not learn of this until about the time of the inspection by the bank examiner; this loaning due in the main to the activities of the bank's president, who according to respectable testimony, at all times prior to the stock market crash believed the loans were safe and with ample collateral. It does not appear that thereafter there was alarm on the part of the bank officers that the bank was in bad shape, or that it was in-

solvent, or bordering on insolvency. The proof warrants the conclusion that the directors believed otherwise.

On what we consider the main point, imputed knowledge of Trustee of the condition of the bank prior to the transfer, there is a lack of evidence which would justify imputation. No witness testified in such a way as to indicate knowledge of impending insolvency. It is true that several of the bank's directors, none of whom were directors of Trustee, testified concerning the method of Mr. Bassett and Mr. Warren in making loans which were not satisfactory to them, but this knowledge or this situation was not reported to Trustee or its officers, except in one instance, and then without hint of danger of insolvency, or of "inherent weakness," or that the value of the bank's stock was in jeopardy. While the record shows that some of the co-directors did attend meetings of the Trust Company, it is not shown that at any of these meetings, prior to the early part of 1931, was there any discussion of the status of the bank. The chancellor in his opinion stated "the record does not show that these two directors were at any time questioned by the directors or officers of the Trust Company upon the financial condition of the bank." There was no discussion as to the quality of the Appleton trust stock, which everyone who had any interest believed to be a sound asset. So, what was the knowledge to be imputed to Trustee?

The answer is that the only knowledge which in reason could have been imputed was that some of the bank directors were dissatisfied with the way that Bassett and Warren were operating in respect to making loans. There was no intimation, nor does it seem, or if so, not expressed by any witness, that the bank's stock was in danger of losing its value. This impression not being in the minds of those charged with knowledge, could not well be imputed to others.

Our conclusion that there was a failure of proof which would form the basis of imputed knowledge, makes it unnecessary to discuss the arguments that the Trustee was chargeable with such knowledge that would require action on its part prior to the transfer. Neither is there room for discussion of the contention that it was the duty of the co-directors having what is called "inside

information'' to disclose, or take steps to protect the trust, which none say was in danger. There are, as cited, substantial authorities which hold that where one person is a director of a bank and an officer of another corporation, his knowledge of the operations of one is not to be imputed to the other. 7 Am. Jur. ''Banks'' 208; Fletcher's Cyc., Corporations, Vol. 3, p. 115; Skaggs v. Big Sandy Commercial Bank, 246 Ky. 157, 54 S. W. 2d 650; C. L. & L. Motor Express Co. v. Achenbach, 259 Ky. 228, 82 S. W. 2d 335, and where interests are adverse, for obvious reasons, the knowledge of one is not imputed to another corporation in which he is interested. Ohio Valley Banking and Trust Co. v. Citizens' Nat. Bank, 173 Ky. 640, 641, 191 S. W. 433.

After a careful perusal of the voluminous briefs, and survey of the record, we are compelled to say that the evidence adduced fails to justify a holding that Trustee was guilty of such negligence as would fasten upon it liability. We are, of course, impressed with appellees' suggestion that the chancellor's findings should be given due weight. This we have done. However, unlike many of the cases in like situations, we cannot overlook the fact that the case was submitted to the chancellor on the record made up in the county court, which embraces the opinion of the county court judge, and the comprehensive report of the court's commissioner, (both able lawyers) and whose report the chancellor characterized as a ''systematic analysis of the testimony, most accurate and helpful,'' with which the chancellor ''in original opinion agreed in many of the findings of fact and conclusions.'' We are led to the impression that the chancellor gave too much emphasis to the diversification phase of the case, and to the inapplicable expressions in the Bryan case. Taking out the effect of non-diversification, and the inapplicable rule emphasized, we find nothing shown here which would cause the court to depart from the general rule frequently expressed by this and other courts, that the fiduciary is not an insurer, but is charged with the exercise of such care as would or should be exercised by ordinarily prudent persons in the management of their own affairs.

Judgment reversed, with directions to set it aside and to confirm the original judgment of the county court.